667 A.2d 999

**Maurice Thomas BUTLER**

v.

**STATE of Maryland.**

**No. 338, Sept.Term, 1995.**

Court of Special Appeals of Maryland.

Dec. 4, 1995.

Melissa M. Moore, Assistant Public Defender (Stephen E. Harris, Public Defender, on the brief), Baltimore, for Appellant.

M. Jennifer Landis, Assistant Attorney General (J. Joseph Curran, Jr., Attorney General, Baltimore, and Jack B. John-

son, State's Attorney for Prince George's County, Upper Marlboro, on the brief), for Appellee.

Submitted before MOYLAN, FISCHER and CATHELL, JJ.

CATHELL, Judge.

Appellant, Maurice Thomas Butler, and three others were charged by criminal indictment with numerous drug-related offenses. Following a three-day trial, a jury in the Circuit Court for Prince George's County found him guilty of the distribution of cocaine, possession of cocaine, and conspiracy to distribute cocaine. Appellant was sentenced to two concurrent twelve-year sentences for the distribution and conspiracy charges; the court merged the possession charge with the distribution charge. This appeal follows, in which appellant presents these questions for our review:

> 1. Did the lower court err in sustaining the [S]tate's objections to proper cross-examination and in refusing to require the [S]tate's witness to give his notes and written report to defense counsel for purposes of cross-examination?
>
> 2. Did the lower court err in admitting hearsay testimony not coming within any recognized exception to the rule prohibiting hearsay?

## STATEMENT OF FACTS [1]

In August and September of 1994, the Prince George's County Police Department, in coordination with the Federal Bureau of Investigation, ran Operation Hornet. The Operation focused on high priority drug areas within the County, as identified by citizens' complaints. One such location was the 4400 Club, named, appropriately, because it is in the 4400 block of Rhode Island Avenue in the Hyattsville–Brentwood area.

---

1. Appellant was tried jointly with Kenneth Ward (Ward), Lemuel Anderson (Anderson), and Leroy Toles (Toles). As this appeal was brought by appellant alone, we shall restrict our discussion accordingly.

According to his own testimony, FBI Special Agent Raymond Bloomer Jr. was in charge of the Operation at that location. He testified that, on September 1, 1994, he began his surveillance of the area at 6:00 p.m., and it continued for about one and a half hours. During that time, he observed what he believed to be, based upon his training and experience, drug-related activity. Eventually, the Agent's attention focused upon appellant and three others, all of whom he believed to be working in concert. In particular, the Agent observed Ward meeting with the three others, including appellant, at different times and places prior to the later purchase of narcotics by an undercover officer.

To confirm his suspicions, Agent Bloomer called upon Prince George's County Police Detective Paul Owens to attempt an undercover purchase of drugs. Detective Owens testified that he, accompanied by another detective, drove their car through the parking lot of the 4400 Club, but were not approached. The detectives circled the block and, on their second pass, were approached by Ward, who asked Detective Owens what he wanted. Detective Owens knew this to mean that Ward was asking what kind of drugs he wanted to purchase and in what amount. The Detective responded that he wanted a "fifty," which, according to the Detective, is the "street" terminology for fifty dollars worth of cocaine. Ward directed the detectives where to wait and indicated that he would return momentarily. At that point, Ward walked up the street, turned a corner, and was out of the Detective's sight. When he returned, two to three minutes later, he handed Detective Owens two sealed baggies containing two rock-like substances, which the Detective believed to be cocaine. Owens handed Ward two twenty-dollar bills and one ten-dollar bill, the serial numbers of which had previously been recorded by the FBI. Having completed the transaction, the detectives left the area and radioed awaiting officers Ward's description. Five minutes later, Detective Owens was called back to the scene to identify Ward as the individual who had sold him the suspected cocaine.

Detective Joseph Espinosa, also of the Prince George's County Police Department, testified that he observed Ward approach appellant in the middle of the street and pass currency to him. The Detective then observed both men walking toward the 4400 Club. Detective Espinosa testified that, when he exited his vehicle to effectuate the arrest, and announced the police presence, Ward took flight. Appellant did not flee; instead, he walked into the club. After chasing Ward and aiding in his arrest, Espinosa also went into the club. He thereupon searched appellant, but found no currency, beeper, baggies, or drugs in his possession.

In his defense, appellant called Rose Delaney, his neighbor. She testified that, on the day in question, she saw appellant around six in the evening a short distance from the 4400 Club, called out to him, and asked him to find Anderson for her. She then stated that she started to walk up the street, and, upon reaching the corner, observed appellant, having been arrested by police, lying on the ground. She asked him, "What you doing on the ground for?" He responded, "I don't know. You just send me up the street. That's all I know."

### 1.

During the cross-examination of FBI Special Agent Bloomer by appellant's trial counsel, the following exchange occurred:

Q What was Mr. Butler wearing that day?

A Mr. Butler was wearing, I believe it was black, I'm not positive.

Q [Do] [y]ou have any notes with you today that you made during your observations?

A Yes, I do.

Q Perhaps we can ask the Agent to look at them. Perhaps I can look at them as well when he's finished.

A (The witness complied) This does not say what he was wearing.

[APPELLANT'S COUNSEL]: Your Honor, may I approach the witness? Review the exhibit as well?

[STATE'S ATTORNEY]: I object.

THE COURT: Sustained.

[APPELLANT'S COUNSEL]: I think under Horne Leonard I'm allowed to look at his notes for cross-examination purposes, not on discovery, for cross-examination issues.

THE COURT: On this one issue.

[APPELLANT'S COUNSEL]: I think I'm allowed to look at his notes. That the notes might show something relevant for Mr. Butler.

THE COURT: Sustained.

[APPELLANT'S COUNSEL]: Thank you.

BY [APPELLANT'S COUNSEL]:

Q   You made note of important things you observed that evening, isn't that correct?

A   Yes.

. . . .

Q   Now did you have any—did you take any photographs of the important observations that you made?

A   No, I did not.

. . . .

Q   . . . But you did have pen and paper with you?

A   Yes.

Q   And you wrote down important things?

A   Yes.

. . . .

Q   You didn't write up any official document saying what you saw, isn't that correct?

A   I did.  Yes, I did.

Q   What would that be?

A   An FD 302.

[APPELLANT'S COUNSEL]: Your Honor, with the court's permission, I'd ask to review the document [Agent Bloomer[2]] wrote up.

[STATE'S ATTORNEY]: I object.

THE COURT: What is this thing?

THE WITNESS: The FD 302 is the report form we write concerning activities that we are involved in.

THE COURT: It's the FBI form?

THE WITNESS: Yes, it is.

BY [APPELLANT'S COUNSEL]:

Q Did you sign that form yourself?

[STATE'S ATTORNEY]: Your Honor, I'm going to object to this line. [Appellant's counsel] is trying to get into the discovery of the FBI. She's not entitled to that.

[APPELLANT'S COUNSEL]: I think I'm trying to see what he wrote for cross-examination.

THE COURT: Sustained.

It is important to note that this colloquy refers to two different writings—Agent Bloomer's notes, made on the day of the arrest and to which he referred during his testimony in an effort to refresh his recollection, and his official FBI report, the FD 302, detailing his activities. We shall discuss each in turn.

## Agent Bloomer's Notes

As Judge Moylan pointed out in *Baker v. State,* 35 Md.App. 593, 371 A.2d 699 (1977), it is important to keep clear the distinctions between the doctrine of present recollection refreshed, alternatively referred to as present recollection revived, and that of past recollection recorded. In *Baker,* a

---

**2.** During this exchange, appellant's trial counsel actually asked "to review the document Officer Wan wrote up." It was Prince George's County Police Officer Wan who arrested Ward and subsequently wrote the report on that arrest. Officer Wan had not yet testified in this trial, and it is clear from the context in which this statement was made that appellant's counsel was, in fact, requesting Agent Bloomer's FD 302 report.

prosecution for murder, the State called the investigating officer to testify about statements made to him by the deceased victim. In its cross-examination, the defense sought to elicit testimony of events leading up to the defendant's arrest. When the officer had difficulty recalling certain facts, the defense sought to utilize a police report, not authored by the witness but by another officer, to stimulate the witness's recollection. Apparently having confused present recollection refreshed with past recollection recorded, the trial court forbade the use of a report authored by one officer to stimulate the memory of the testifying officer. This, we said, was reversible error.[3] After delving into the subtleties of the two doctrines, Judge Moylan noted, with respect to present recollection refreshed, that once the witness has reviewed the memory-refreshing item, "[t]he opposing party, of course, has the right to inspect the memory aid, be it a writing or otherwise, and even to show it to the jury." *Id.* at 600, 371 A.2d 699. *See also United States v. Socony–Vacuum Oil Co.,* 310 U.S. 150, 233, 60 S.Ct. 811, 849, 84 L.Ed. 1129 (1940) ("Normally, of course, the material ... used [to refresh a witness's recollection] must be shown to opposing counsel upon demand, if it is handed to the witness."); 3 John H. Wigmore, *Evidence* § 762 (Chadbourn rev. ed. 1970) (advising that, once writing has been shown to a witness, "the writing must be shown to [the opposing party] on request ... [so that he] may expose all that detracts from the weight of the testimony") (emphasis and footnote omitted).

In *Fitzwater v. State,* 57 Md.App. 274, 469 A.2d 909 (1984), at a trial for various motor vehicle offenses, the State called the arresting officer who, prior to, but not during, his testimony, referred to some notes he had previously taken. On appeal, Fitzwater argued that the trial court erred because it had not permitted his counsel to review the officer's notes. Applying the doctrine of present recollection refreshed, we

---

3. For a more complete discussion in respect to when a witness may be permitted to refresh his memory in the first instance, see *Oken v. State,* 327 Md. 628, 670, 612 A.2d 258 (1992).

held that no error had been committed. This was true, we said, because

> at most the evidence shows that [the officer] opened his folder prior to the time he was on the witness stand. There is no rule prohibiting a witness from refreshing his recollection prior to taking the oath and testifying....
>
> ... Since the court determined that [the officer] was not using the document to refresh his recollection [while on the witness stand], there was no reason for Fitzwater's counsel to view it.

*Id.* at 285, 469 A.2d 909.

Whether a party may use a writing or other object to refresh the failing memory of a witness lies within the sound discretion of the trial court. *Askins v. State,* 13 Md. App. 702, 711, 284 A.2d 626 (1971), *cert. denied,* 264 Md. 745 (1972). Precisely how much of the document may be examined by defense counsel depends largely on the *circumstances* of the case, *Contee v. State,* 223 Md. 575, 581–82, 165 A.2d 889 (1960), and is also committed to the sound discretion of the trial court. This is to be guided, at least in part, by the relationship between the subject matter of the witness's testimony and the document. In *Contee,* coincidentally, the arresting officer consulted his notebook in response to a question as to what the defendant was wearing when he was arrested. *Id.* at 581, 165 A.2d 889. Although that decision left open the scope of defense counsel's right to cross-examine from the notebook, the Court of Appeals made clear that the adverse party's opportunity to examine the document was as of right. *Id.*

The doctrine of present recollection refreshed, as developed by our common law, is now embodied in Maryland Rule 5–612. It regulates the use of a writing or other item by a witness to refresh his or her memory while testifying. That Rule reads:

> If, while testifying, a witness uses a writing or other item to refresh memory, any party is entitled to inspect it, to examine the witness about it, and to introduce in evidence

those portions which relate to the testimony of the witness for the limited purpose of impeaching the witness as to whether the item in fact refreshes the witness's recollection.

Rule 5–612 is based upon Federal Rule of Evidence (FRE) 612. One major distinction between the two, however, is that, under FRE 612, the adverse party may be entitled to examine the memory-refreshing document if it is used by the witness either while *or before* testifying.[4] Prior to codification of the evidentiary provisions of the Maryland Rules, we rejected the proposition that an adverse party was entitled to examine a document if a witness used it before, but not while, testifying. *See Fitzwater, supra,* 57 Md.App. 274, 469 A.2d 909. Rule 5–612, as subsequently adopted, is wholly consistent with our prior decisions, and, therefore, those decisions are instructive in its application. Accordingly, we hold that, while it is within the sound discretion of the trial judge either to allow or restrict the use of an item to refresh the present recollection of a witness, once the use of an item for that purpose is allowed, defense counsel must be awarded the opportunity "to inspect it, to examine the witness about it, and to introduce in evidence those portions which relate to the testimony of the

---

**4.** FRE 612 provides:

Except as otherwise provided in criminal proceedings by section 3500 of title 18, United States Code, if a witness uses a writing to refresh memory for the purpose of testifying, either—

    (1) while testifying, or

    (2) before testifying, if the court in its discretion determines it is necessary in the interests of justice,

an adverse party is entitled to have the writing produced at the hearing, to inspect it, to cross-examine the witness thereon, and to introduce in evidence those portions which relate to the testimony of the witness. If it is claimed that the writing contains matters not related to the subject matter of the testimony the court shall examine the writing in camera, excise any portions not so related, and order delivery of the remainder to the party entitled thereto. Any portion withheld over objections shall be preserved and made available to the appellate court in the event of an appeal. If a writing is not produced or delivered pursuant to order under this rule, the court shall make any order justice requires, except that in criminal cases when the prosecution elects not to comply, the order shall be one striking the testimony or, if the court in its discretion determines that the interests of justice so require, declaring a mistrial.

witness for the limited purpose of impeaching the witness as to whether the item in fact refreshes the witness's recollection." Rule 5–612.

In the case *sub judice,* once the trial court allowed the witness's memory to be refreshed, it was error not to allow inspection of the memorandum by defense counsel. That Agent Bloomer's notes did not, in fact, refresh his recollection as to what appellant was wearing on the day in question is of little significance. Assuming *arguendo* that the notes indicated that appellant was wearing a white shirt and blue jeans, if such a notation had not refreshed the Agent's *present* recollection, he would have been obliged to so state. In such a case, defense counsel would have been entitled to inspect the notes, find such a description, use it to impeach Agent Bloomer's present recollection of the happenings, and even offer that portion of the notes containing the description into evidence for purposes of impeachment. Without the opportunity to inspect the notes for the presence of such a description, the impeachment of an important adverse witness might not be possible, thus thwarting the purpose of the Rule.

### The FD 302

In *Carr v. State,* 284 Md. 455, 397 A.2d 606 (1979), the Court of Appeals "first held that at trial, upon request, defense counsel must be permitted the opportunity to inspect prior statements of the State's witnesses for purposes of cross-examination." *Jones v. State,* 310 Md. 569, 582–83, 530 A.2d 743 (1987), *vacated,* 486 U.S. 1050, 108 S.Ct. 2815, 100 L.Ed.2d 916 *aff'd in part and vacated on other grounds,* 314 Md. 111, 549 A.2d 17 (1988). *As expounded upon in Leonard v. State,* 46 Md.App. 631, 637, 421 A.2d 85 (1980), *aff'd,* 290 Md. 295, 429 A.2d 538 (1981),

> *Carr* makes clear beyond question that a defendant's right, at trial, to inspect the prior statement of a State's witness who has testified is not necessarily limited (1) by the rules pertaining to pretrial discovery, or (2) to statements that are merely exculpatory.

"For purposes of applying the rule of *Carr,* . . . a 'statement' under Maryland law is one given by a witness under the circumstances set forth in § 3500(e) [of the Jencks Act, Title 18 of the United States Code]." *Jones,* 310 Md. at 586, 530 A.2d 743. In pertinent part, § 3500(e) provides:

The term "statement," as used in . . . relation to any witness . . . means—

(1) a written statement made by said witness and signed or otherwise adopted or approved by him;

(2) a stenographic, mechanical, electrical, or other recording, or a transcription thereof, which is a substantially verbatim recital of an oral statement made by said witness and recorded contemporaneously with the making of such oral statement; or

(3) a statement, however taken or recorded, or a transcription thereof, if any, made by said witness to a grand jury.

In *United States v. Hinton,* 719 F.2d 711, 713 (4th Cir.1983), *cert. denied,* 465 U.S. 1032, 104 S.Ct. 1300, 79 L.Ed.2d 699 (1984), the defendant claimed error based upon the "failure to produce statements which the defendant argued should have been preserved and made available for impeachment during the cross-examination of the Government witness Sexton under the terms of § 3500, 18 U.S.C." For purposes of our discussion, it is important to note that "Government witness Sexton" was, and perhaps still is, an agent of the FBI. During the course of his investigation, Agent Sexton took notes while conducting the interview of a witness. From those notes, the agent prepared an FD 302. Subsequently, his notes were either misplaced or destroyed. While the FD 302 was disclosed to the defense, the notes, obviously, could not be. The defense claimed that the agent's notes were a "statement" under the Jencks Act and that, due to the failure to produce those notes, the agent's testimony should be stricken. In analyzing this question, the Fourth Circuit noted that the FD 302 was developed by the Department of Justice in direct response to the Supreme Court's decision giving rise to

the Act, *Jencks v. United States,* 353 U.S. 657, 77 S.Ct. 1007, 1 L.Ed.2d 1103 (1957). *Hinton,* 719 F.2d at 714 n. 2. The court also commented on how

> [i]mmediately after the enactment of § 3500, the Department of Justice prepared and issued instructions to the agents of the Federal Bureau of Investigation on their obligations under the [Jencks] Act and particularly on what "statements" were within the Act. In its instructions it declared that the Act did not require an agent to retain the rough interview notes made of a witness'[s] statement which are incorporated in the agent's later formal interview [FD] 302 report but that the formal 302 interview report of the rough notes alone was required to be preserved, subject to production under the Act.

*Id.* at 716 (footnote omitted). Thus, the FBI developed the FD 302 for the particular purpose of recording a witness's statement for disclosure to the defense and, accordingly, the agents prepare their reports under the specter of disclosure.

 ■ In the usual case, defense counsel will request the investigating officer's reports in order to impeach a witness whom the officer has interviewed. *See, e.g., Bruce v. State,* 318 Md. 706, 723–24, 569 A.2d 1254 (1990), *cert. denied,* —— U.S. ——, 113 S.Ct. 2936, 124 L.Ed.2d 686 (1992); *Jones,* 310 Md. at 586, 530 A.2d 743; *Whitehead v. State,* 54 Md.App. 428, 439–41, 458 A.2d 905, *cert. denied,* 296 Md. 655 (1983). Generally, under § 3500(e), these notes or reports are not discoverable unless the witness signed, adopted, or approved of the statement as recorded by the interviewing officer. *Bruce,* 318 Md. at 724–25, 569 A.2d 1254 (citing *United States v. Hogan,* 763 F.2d 697, 704 (5th Cir.1985) (Where the witness neither signed, read, nor heard the notes in their entirety, the notes failed to qualify as a statement under subsection (e)(1) of the Jencks Act.)); *Jones,* 310 Md. at 586, 530 A.2d 743. This is not, however, the case here. The witness the defense sought to impeach through the use of the FD 302, Agent Bloomer, was the author of the report. There can be no argument that the person taking the statement misheard, misinterpreted, misquoted, or misunderstood what the witness related, for, in

the case at bar, they were one and the same. There is no doubt that Agent Bloomer adopted the FD 302 or that the report was a verbatim recital of his statements. The report contains his observations; it is his own statement. *See United States v. Welch,* 810 F.2d 485 (5th Cir.) ("[I]nvestigation reports can be an agent's 'statement' required to be produced under the Jencks Act." (emphasis omitted)), *cert. denied,* 484 U.S. 955, 108 S.Ct. 350, 98 L.Ed.2d 376 (1987); *United States v. Petito,* 671 F.2d 68 (2d Cir.1982) ("Under the Jencks Act appellant was entitled to production of the surveillance report because it constituted the 'statement' of a government witness, [the investigating officer], relating to the subject matter about which the witness had testified, his observation of [appellant]."), *cert. denied,* 459 U.S. 824, 103 S.Ct. 56, 74 L.Ed.2d 60 (1982); *United States v. Sink,* 586 F.2d 1041, 1051 (5th Cir.1978) (holding that an agent's investigation report, which the agent prepared from his notes and recollections from witness interviews, was a statement as to the agent), *cert. denied,* 443 U.S. 912, 99 S.Ct. 3102, 61 L.Ed.2d 876 (1979); *Kanaras v. State,* 54 Md.App. 568, 580, 460 A.2d 61 (On a case-by-case basis, "[p]olice reports may or may not provide 'statements' under *Carr* and *Leonard.* To the extent that they do, there exists no sanctuary by virtue of the uniform or the badge."), *cert. denied,* 297 Md. 109 (1983); *cf. United States v. Scotti,* 47 F.3d 1237, 1249 (2d Cir.1995) (stating that FBI agent's FD 302, recounting witness interview, was properly disclosed to defense because witness had adopted the statement).

██ It is unclear from the record before us whether the State's Attorney was aware of or in possession of Agent Bloomer's FD 302. In any event, during all relevant times, the FBI, and Agent Bloomer in particular, were working in close coordination with the Prince George's County Police Department. By his own testimony, Agent Bloomer was in charge of the operation at the 4400 Club. In such a capacity, he was directing the actions of Prince George's County officers. Presumably, the State's Attorney interviewed the Agent before putting him on the witness stand and, at that time, had

the opportunity to become aware of and to request copies of his report. Arguably, that report was in the hands of another jurisdiction, the federal government. Operation Hornet, however, was interjurisdictional; had a Prince George's County officer been in charge of the operation and authored a similar report, certainly that report would have been discoverable. For us to hold in the case *sub judice* that Agent Bloomer's report is not discoverable for this reason alone draws too narrow a distinction.

As we stated in *Aud v. State*, 72 Md.App. 508, 522–23, 531 A.2d 706 (1987) (citing both *Carr* and *Leonard*), *cert. denied*, 311 Md. 557, 536 A.2d 664 (1988):

Unquestionably, under Maryland law, denying defense counsel a copy of a witness's *written* statement prior to the commencement of cross-examination amounts to a denial to the defendant of due process of law. The error is not cured by allowing the court to review the written statement in order to determine its usefulness, inasmuch as that judgment is for defense counsel to make, not the court. [Citations omitted.]

The case against appellant rested, in large part, upon Agent Bloomer's testimony. It was his testimony that placed appellant at the scene for an extended period of time and in meetings that the agent believed to be for the purpose of conducting narcotics transactions. Neither we nor the trial judge are in the same position as defense counsel to evaluate the prior statement of a witness for purposes of determining its value for impeachment. Thus, the trial court erred in denying appellant access to Agent Bloomer's FD 302. Moreover, we are unable to declare that the denial of access to the Agent's statement was harmless beyond a reasonable doubt and, therefore, we shall reverse the decision of the trial court and remand this case to that court for a new trial.

### 2.

During the State's examination of Detective Espinosa, the following exchange occurred:

Q   Two of the twenty dollar bills [recovered from defendant Toles] were the pre-recorded buy money?

A   Yes, it was.

Q   Did you verify it or did the FBI agent verify it?

[COUNSEL FOR DEFENDANT TOLES]: Objection.

[APPELLANT'S COUNSEL]: Objection.   Move to strike.

THE COURT: Overruled.   Motion denied.

BY [STATE'S ATTORNEY]:

Q   Did you?

A   Yes.

Appellant contends, "In this case, Detective Espinosa's testimony that the pre-recorded buy money was verified by the FBI agent was a hearsay statement by the FBI agent, clearly introduced to prove the truth of the matter asserted therein. . . .   As the testimony was hearsay not coming within any exception and as it was critical in proving appellant's guilt, the trial court's error in admitting the testimony cannot be said to be harmless beyond a reasonable doubt."   Although our resolution of appellant's first issue makes discussion of his second argument unnecessary, we note, in passing, that, in the exchange cited above, no hearsay testimony was elicited from Detective Espinosa.   Had Detective Espinosa stated that the FBI agent had verified that the money recovered was the prerecorded money, that testimony would have been hearsay.   No such answer was, in fact, given.   Defense counsel interposed an objection before Detective Espinosa could respond.   Once the court overruled the objection, the State's attorney then asked, "Did you?," to which the detective responded affirmatively.   In other words, Detective Espinosa stated that it was *he* who verified the status of the currency recovered from defendant Toles.   Therefore, no hearsay testimony was elicited and, in this instance, the hearsay rule functioned precisely as designed—that is, the State asked a question that may have prompted a hearsay response, defense counsel objected to the question before an answer was offered, and the

State's Attorney reformulated her question so as to avoid an inadmissible response.

## CONCLUSION

As heretofore discussed, the trial court erred in refusing to permit defense counsel to inspect the notes used by Agent Bloomer to refresh his recollection under Maryland Rule 5–612.[5] The court also erred in failing to order the State to disclose the Agent's FD 302 report. As Agent Bloomer was one of the State's chief witnesses in its case against appellant, the opportunity and, indeed, the right, to cross-examine him was vital. In this case, that right was compromised. We cannot, therefore, conclude that these errors were harmless beyond a reasonable doubt.

**JUDGMENT REVERSED; CASE REMANDED TO THE CIRCUIT COURT FOR PRINCE GEORGE'S COUNTY; COSTS TO BE PAID BY PRINCE GEORGE'S COUNTY.**

---

5. Given our finding that appellant was entitled to inspect the notes because the agent used them to refresh his recollection while testifying, we decline to address appellant's argument that the notes constituted the agent's statement under *Carr* and *Leonard.*